**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ANU SHAH,<br><br>*Plaintiff*,<br><br>-against-<br><br>VIRAL BHAGAT, a/k/a Viral Utpal Bhagat, a/k/a "Bhaggu,"<br><br>*Defendant*. | Civil Action No.: __________<br><br>**FIRST AMENDED COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff Anu Shah ("Plaintiff"), appearing *pro se*, for her First Amended Complaint against Defendant Viral Bhagat, a/k/a Viral Utpal Bhagat, a/k/a "Bhaggu" ("Defendant"), alleges as follows, upon personal knowledge as to her own acts and upon information and belief as to all other matters:

## NATURE OF THE ACTION

1. This action arises from Defendant's deliberate use of Plaintiff's intellectual property and commercial identity to injure her business and livelihood. Defendant seized Plaintiff's federally registered "The Talk Lane" service mark as the address of an infringing website; populated that website with Plaintiff's registered, copyrighted photographs used without authorization; deployed the mark and metadata to divert to his own site the New York audience, sponsors, and prospective guests searching for Plaintiff's New York enterprise; and, on three separate occasions, demanded $100,000 from Plaintiff, a New York resident, in exchange for taking the site down. Although Defendant's conduct was motivated by Plaintiff's rejection of his romantic overtures, and although he also published false and defamatory statements as one of his weapons, the injuries pleaded

here are not limited to reputation: the unauthorized copying of Plaintiff's photographs and the seizure of and monetary demands concerning her mark-bearing domain are commercial and property wrongs that would exist irrespective of any reputational effect. Additionally, the Plaintiff is also monetizing the site with sponsored ads listing.

2. Plaintiff accordingly asserts claims for: (a) cybersquatting in violation of the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d)(1); (b) copyright infringement in violation of the Copyright Act, 17 U.S.C. § 101 et seq.; (c) trademark infringement in violation of § 32 of the Lanham Act, 15 U.S.C. § 1114; (d) false designation of origin, passing off, and unfair competition in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (e) trademark counterfeiting in violation of 15 U.S.C. §§ 1114(1)(a)–(b), 1116(d), and 1117(b)–(c); (f) trademark dilution by tarnishment under N.Y. Gen. Bus. Law § 360-l; and the common-law claims of (g) defamation, (h) tortious interference with prospective business relations, and (i) intentional infliction of emotional distress.

## JURISDICTION AND VENUE

3. This Court has subject-matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1338(a), and pursuant to 15 U.S.C. § 1121, as this action arises under the Lanham Act, 15 U.S.C. §§ 1051 et seq., and the Copyright Act, 17 U.S.C. § 101 et seq. The Court has jurisdiction over the related claims for false designation of origin and unfair competition pursuant to 28 U.S.C. § 1338(b). The Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332, because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4. This Court has personal jurisdiction over Defendant pursuant to N.Y. C.P.L.R. § 302(a)(1) and Fed. R. Civ. P. 4(k)(1)(A), because Defendant transacted business within New York and each of Plaintiff's claims arises from that business, as set forth below.

5. Defendant did not merely post a passive, informational webpage accessible in New York. As alleged with particularity below, Defendant (a) purchased paid search-engine advertising keyed to Plaintiff's name and to the "THE TALK LANE" mark and directed that advertising at the New York market where Plaintiff's audience, sponsors, and livelihood are concentrated; (b) monetized the New York visitor traffic so diverted by causing third-party commercial advertisements to be served from the Infringing Websites; and (c) on three occasions over nine months demanded that Plaintiff, a New York resident, pay him $100,000 in exchange for removal of the mark-bearing site. Each claim asserted herein arises from this New York-directed commercial course of conduct.

6. On multiple occasions between 2025 and 2026, Plaintiff, located in New York County and using a device located in New York, entered the search terms "The Talk Lane" and "Anu Shah" into the Google search engine. On each occasion, the results displayed the Infringing Website prominently on the first page, adjacent to, and at times immediately before or below, Plaintiff's official website, thetalklane.com under a title pairing Plaintiff's name and Mark with the words "Web of Lies: Arrest, Lawsuits, and False Claims." (**Ex. A**). Plaintiff's observations are corroborated by contemporaneous reports from within the New York market: Sometime between September and November , 2025, a principal of Hype Marketing, an agency through which Plaintiff was pursuing sponsorship arrangements, wrote to Plaintiff that several New York sponsors searching "The Talk Lane New York" on Google had reached the Infringing Website rather than

Plaintiff's official website, and that the site was creating "confusion" as to which site actually represents Plaintiff's brand and business. Additionally he pointed that the sponsors found advertisements on that infringing page of inappropriate nature (**Ex. B**). Plaintiff has lost high profile sponsorships from the sponsors in New York City and Globally costing millions of dollars in revenue

7. The Infringing Websites are hosted at generic Amazon Web Services "S3" bucket addresses. Such addresses carry no independent goodwill, brand recognition, or history of inbound links, and pages hosted at them do not ordinarily achieve first-page placement in searches for an established brand, above or alongside the brand owner's own website. The Infringing Website's prominence in searches for Plaintiff's name and Mark is instead the product of Defendant's deliberate engineering, including: (a) metadata keywords embedded in the site's source code pairing Plaintiff's name and the Mark with sensational terms such as "arrest," "fraud," "lawsuits," and "hacking" (**Ex. C**); (b) a page title constructed to match searches for Plaintiff and the Mark; and (c) the dissemination of the site's address to third-party platforms and to members of Plaintiff's professional network, including the Quora postings and direct transmissions alleged below, generating the inbound links and engagement signals that search engines treat as indicia of relevance.

8. Upon information and belief, founded on the Infringing Website's sustained first-page prominence notwithstanding its generic hosting address; on the observed service of third-party advertisements to the site's visitors, reflecting its enrollment with traffic-monetization services; and on Defendant's recorded statement of intent that "[a]nybody who searches for her, will find the website" Defendant has also employed one or more paid traffic-acquisition, click-generation, or search-optimization tools or services

that purchase or simulate user engagement in order to elevate and maintain the Infringing Website's ranking relative to Plaintiff's official website. The records that would identify the particular tools and services used account enrollments, payment records, traffic and referral logs, and analytics data are within the exclusive possession, custody, and control of Defendant and of the search, hosting, advertising, and analytics providers he employed.

9. Defendant's engineering of the Infringing Website's search prominence served purposes both commercial and reputational: (a) to intercept and divert the sponsors, agencies, guests, and prospective clients searching for Plaintiff's enterprise, in furtherance of his stated objective that Plaintiff "will have zero ability to earn a living"; (b) to maximize the visitor traffic from which, through third-party advertising, he derived or stood to derive revenue; (c) to increase the leverage behind his repeated $100,000 extortion demands the more prominently the site appeared to Plaintiff's market, the more its removal was worth to her; and (d) to ensure that the first thing Plaintiff's New York market encountered when searching for her brand was Defendant's content, tarnishing the Mark at the point of discovery.

10. In or about October / November of 2025, Mahmood Rizwan, a principal of Hype Marketing, an agency through which Plaintiff was then pursuing sponsorship arrangements for The Talk Lane, and several New York-based sponsors with whom Mr. Rizwan was then working, accessed the Infringing Website. As Mr. Rizwan reported to Plaintiff in writing, visitors to the site were served automated, clickable third-party pop-up advertisements that opened in separate browser windows and redirected the

visitor to external commercial destinations unrelated to Defendant or to the stated content of the site, including advertisements of an obscene or adult nature. (**Ex. B**).

11. Third-party advertising networks compensate the operators of websites on which their advertisements are served, on a per-impression or per-click basis, at rates that vary with, among other things, the geographic location of the visitor. Upon information and belief founded on the service of such advertisements to visitors located in New York as alleged above and on the presence of ad-serving scripts in the site's source code as alleged herein, Defendant enrolled the Infringing Websites with one or more such networks and has derived revenue from the New York visitor traffic that his use of Plaintiff's name and Mark diverted to the sites. The enrollment, traffic, and payment records that will confirm the scope of that revenue are within the exclusive possession, custody, and control of Defendant, the advertising networks, and Defendant's hosting provider.

12. On at least three occasions, on or about April 2025, June 2025, and January 22, 2026, Defendant sent written communications from his various e-mail account (viral.u.bhagat@proton.me; viral.bhagat@proton.me; viralbhagat@proton.me) to Plaintiff, whom Defendant knew to reside in New York County, each demanding payment of $100,000 in exchange for removal of the infringing, mark-bearing website. (**Ex. D**). In the January 22, 2026 communication, Defendant wrote that "the cost is $100,000," that "[u]pon receipt of payment, all hosted materials will be taken down," and that otherwise "the site remains live." Through this sustained, nine-month course of conduct, Defendant repeatedly reached into New York and sought to consummate a $100,000 commercial transaction with a New York resident concerning the mark-bearing internet address, an

offer to relinquish the address for financial gain within the meaning of 15 U.S.C. § 1125(d)(1)(B)(i)(VI) and the transaction of business within New York.

13. Defendant knew at all relevant times that Plaintiff resided in New York County, that The Talk Lane was operated and recorded in New York, and that Plaintiff's audience, sponsors, and livelihood were centered in New York. Among other things: (a) on January 19, 2023, Plaintiff informed Defendant in writing that she was based in New York (**Ex. E**); (b) on September 11, 2024, while directing the harvesting of Plaintiff's photographs, Defendant asked his associates, "Do you think this is her NYC apartment?" (**Ex. F**); (c) Defendant and his associates planned to "put something online so that people googling her name" would find it, so that "[a]nybody who searches for her, will find the website" (**Ex. G**) and "[s]he will have zero ability to earn a living" (**Ex. H**); and (d) the metadata Defendant embedded in the Infringing Websites paired Plaintiff's name and Mark with terms selected to reach the very audience concentrated in New York on which her enterprise depends (**Ex. C**). Defendant's search-engine strategy was thus not directed at an undifferentiated national audience but was engineered to intercept the specific New York consumers, sponsors, and counterparties searching for Plaintiff's New York enterprise.

14. The Talk Lane is operated from, and its episodes are recorded in, New York; and Plaintiff's business is registered in New York. New York constitutes the single largest share of The Talk Lane's United States audience, with approximately 14,000 views and 1,000+ watch-hours, as reflected in the channel's analytics. (**Ex. I**.) Defendant knew that Plaintiff resided and operated her business in New York and directed his conduct at

Plaintiff's New York-based livelihood. The injury caused by Defendant's conduct was therefore suffered in New York.

14. This Court has specific personal jurisdiction over Defendant under N.Y. C.P.L.R. § 302(a)(1) and Fed. R. Civ. P. 4(k)(1)(A) because Defendant transacted business within New York and each claim arises from that transaction. Defendant's New York business activity consists of, among other things: (a) his purchase and geographic targeting of paid search advertising to solicit New York consumers using Plaintiff's name and Mark; (b) his commercial monetization of the New York visitor traffic thereby diverted; and (c) his repeated written attempts to consummate a $100,000 transaction with a New York resident concerning the mark-bearing address. These are purposeful commercial acts projected into New York.

15. Each claim arises from those New York transactions. The cybersquatting claim arises from Defendant's bad-faith use of the mark-bearing address and his demands for payment from its New York owner; the trademark, counterfeiting, and unfair-competition claims arise from Defendant's use of the Mark to solicit and divert New York consumers and from the resulting confusion of no less than one New York sponsor; and the copyright claim arises from Defendant's unauthorized reproduction and display of Plaintiff's registered Photographs as the content of the same commercially exploited, New York-directed websites.

16. Independently, this Court has jurisdiction over the copyright, cybersquatting, and trademark claims under CPLR § 302(a)(3)(ii): Defendant committed intentional torts outside New York; those torts caused injury within New York, where Plaintiff, the owner of the registered copyrights and the Mark, resides and operates her enterprise, and where

the lost the StrtpBoost sponsorship and the diversion of her New York audience occurred;[1] Defendant expected or reasonably should have expected his acts to have consequences in New York, as his own contemporaneous statements establish; and Defendant derives substantial revenue from interstate commerce, including a fully-monetized YouTube Channel, and listeners and watchers in several states and counties.

17. Plaintiff has lost sponsorships from New York based Strtupboost exceeding in $100,000+

18. The injuries underlying Plaintiff's copyright, cybersquatting, trademark, and counterfeiting claims are property and commercial injuries that exist irrespective of any effect on Plaintiff's reputation: the unauthorized reproduction and public display of registered photographic works; the bad-faith registration, use, and attempted ransom of the mark-bearing address; and the diversion and monetization of commercial traffic belonging to Plaintiff's enterprise. Because these claims neither seek damages solely for injury to reputation nor assert harms that flow entirely from reputational effect, they are not subject to the defamation exclusions of CPLR §§ 302(a)(2) and (a)(3).

19. Plaintiff's tortious-interference claim likewise does not rest on generalized reputational harm. Defendant directly interceded with specific, identified third parties with whom Plaintiff had prospective business relations (by creating fake linkedin accounts to access her profile and find all her connections and disseminate that to her guests on the show): additionally he also transmitted the Infringing Website directly to journalist Michael Balter, of the Croton Chronicle, an online newspaper, on April 5, 2026 (**Ex. J**); caused

---

[1] *See Penguin Grp. (USA) Inc. v. Am. Buddha*, 16 N.Y.3d 295 (2011) (situs of injury for internet-based copyright infringement is the location of the copyright holder)

the site and related materials to be disseminated to identified members of Plaintiff's professional network, including past and prospective podcast guests and sponsors. Plaintiff's injury from this conduct is the direct loss of identified commercial relationships resulting from Defendant's intervention with those counterparties.

20. To the extent New York's long-arm exclusions would otherwise restrict Plaintiff's common-law claims for defamation and intentional infliction of emotional distress, the Court may exercise pendent personal jurisdiction over those claims because they arise from the same common nucleus of operative fact as the federal intellectual-property claims over which jurisdiction independently lies, the creation, hosting, commercial exploitation, and attempted ransom of the same Infringing Websites, such that adjudicating all claims together serves judicial economy and fairness.

21. The exercise of jurisdiction comports with due process. Defendant purposefully directed his conduct at New York targeting a New York resident's New York enterprise, soliciting New York consumers with paid advertising, monetizing New York visitors, and demanding payment from a New York resident with the expressly stated objective of destroying Plaintiff's ability to earn a living where she lives and works. Plaintiff's claims arise from those forum contacts, and Defendant, having deliberately reached into New York to extract $100,000 from a New York resident and to divert her New York market, could reasonably anticipate being haled into court here. No considerations of burden, forum interest, or interstate efficiency render jurisdiction unreasonable.

21. This Court has supplemental jurisdiction over Plaintiff's related State and City law claims pursuant to 28 U.S.C. § 1367.

22. Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events giving rise to these claims — including Defendant's payment demands directed into New York and the injury to Plaintiff's New York enterprise — occurred in New York County, New York.

## STATEMENT OF FACTS

## I. THE PARTIES

### A. Plaintiff Anu Shah

23. Plaintiff Anu Shah is an entrepreneur, podcast host, and media professional based in New York County, New York. She is the founder and operator of The Talk Lane, a commercial podcast platform launched November, 2024, featuring interviews with internationally recognized business leaders, innovators, and public figures.

### B. Plaintiff's Business Enterprise: The Talk Lane

24. The Talk Lane is a podcast channel and podcast-production enterprise — a profit-generating commercial business with established market value and revenue streams, including:

i. Approximately 8,000 YouTube subscribers, watch-hours, and approximately 1,350 Instagram followers;

ii. High-profile guests including Aseem Puri (CEO of Unilever Digital), Baroness Usha Prashar (MP, House of Lords UK), Lord Karan Bilimoria (MP House of Lords, UK), Manoj Kohli (former SoftBank India CEO), and Esther Wojcicki (Educator, Mother In Law Of Sergi Brin - cofounder of Google, Mother of CEO of Youtube and 23&Me), Subhash Garg (former secretary of finance and commerce, India) among others;

iii. Features in publications such as MarketWatch and New India Abroad; and

iv. A commerce model offering end-to-end podcast services, studio recording, video editing, content and redistribution strategy, branding and marketing services, sponsored episodes, brand sponsorships and collaborations, and YouTube creator monetization.

V. The platform is monetized via sponsors, watch time on youtube and end to end podcast services

25. Plaintiff has taken steps to protect the intellectual property of The Talk Lane, including:

i. Federal Service Mark "THE TALK LANE" (USPTO Serial No. 99708248, Class 041, first use in commerce November, 2024) (**Ex. K**); and

ii. United States Copyright Registrations, including VA 2-499-720 (Group of Published Photographs, covering photographs published March 2018–December 31, 2023); VA 2-450-298 (Self Portrait 1, published August 18, 2018); and VA 2-450-299 (Self Portrait 3, published May 31, 2019), together with a Supplementary Registration (May 11, 2026) clarifying the completion and first-publication dates of Self Portrait 1. (**Ex. L**).

26. The Talk Lane represents substantial commercial value and a growing platform for Plaintiff's professional endeavors and income generation.

**C. Defendant Viral Bhagat**

27. Defendant Viral Bhagat is a resident of Mountain View, California, and is a software engineer specializing in cloud infrastructure. During the relevant period he was employed at, among other companies, eBay (beginning September 2023) and Oracle (November 2023–August 2025).

28. Defendant created, authored, hosted, and published the defamatory websites at issue at the following addresses:

   i. Original Website (January 2025): http://thetalklane.s3-website-us-east-1.amazonaws.com (**Ex. M**); and

   ii. Republished Website (July 2025): https://fraud-1.s3.us-east-1.amazonaws.com/index.html (**Ex. N**).

29. At his July 10, 2025 deposition, Defendant admitted under oath: "I created this web page"; "Yes, it is fair to say" (that he wrote the code); and "Yes, that is true" (that he had the ability to take the site down). (**Ex. O**).

## II. DEFENDANT'S SEIZURE OF PLAINTIFF'S TRADEMARK AND OPERATION OF THE INFRINGING WEBSITES

### A. Original Publication (January 2025)

30. In January 2025, Defendant published the Original Website at http://thetalklane.s3-website-us-east-1.amazonaws.com, titled "Anu Shah's (The Talk Lane) Web of Lies: Arrest, Lawsuits, and False Claims."

31. At his July 10, 2025 deposition, Defendant admitted: "I created this web page"; "Yes, it is fair to say" (as to writing the code); and "Yes, that is true" (as to his ability to take the site down). (**Ex. O**)

32. Defendant thus established his authorship of, control over, and continuing responsibility for the Original Website.

### B. Trademark Misappropriation

33. By incorporating "The Talk Lane" mark into the title, URL, and content of the website, Defendant appropriated Plaintiff's commercial brand. The website expressly referenced

Plaintiff's podcast guests (*e.g.*, "Lord Bilimoria," "Aseem Puri of Unilever," "Usha Prashar," "Manoj Kohli").

34. Defendant's use of the mark was not incidental or purely referential; it targeted Plaintiff's commercial enterprise to divert her audience and prospective clients to his content.

**C. Second Website Publication (July 2025)**

35. Sometime in July 2025, Amazon Web Services notified Defendant that photographs on the site infringed Plaintiff's copyrights. Rather than ceasing the infringement, Defendant republished the website at a new URL with altered content, a changed title, and different photographs, likewise used without authorization.

36. Defendant published the Republished Website at https://fraud-1.s3.us-east-1.amazonaws.com/index.html, titled "Anu Shah's (The Talk Lane) Troubled Story: Arrest, Lawsuits, and Fabricated Claims."

37. The republication reflected selective editorial removal of the most clearly indefensible statements while maintaining others:

> Removed: "Arrested Feb 14, 2024"; "Fired from Meta/Facebook for hacking into Jason Kothari's facebook account"; and "Her own attorneys … have accused her of not paying legal bills."
>
> Maintained: the eviction allegations; general hacking references; FBI/FTC complaint references (without disclosure); and curated docket hyperlinks.

38. The selective removal of the most clearly indefensible statements, while maintaining others that could be characterized as "opinion" or as "based on litigation filings," reflects Defendant's knowledge of which statements were most vulnerable to being proven false.

39. In his deposition in July 2025, he admitted under the oath that he is not certain that all the accusations or claims that he made on his site are verified or real. He admits that it is hearsay. (Ex.O)

## III. DEFENDANT'S UNAUTHORIZED HARVESTING AND USE OF PLAINTIFF'S COPYRIGHTED PHOTOGRAPHS

### A. Unauthorized Downloading

39. On September 11, 2024, Defendant directed Tathagata Sarkar to download photographs from Plaintiff's LinkedIn profile without authorization: "Could you please download all the pictures from this post and send them to me?" (**Ex. P** at CTRL_00004990).

40. Sarkar transmitted a compressed archive titled "anushah.zip" containing photographs harvested from Plaintiff's LinkedIn profile without authorization.

41. Rushad Dordi participated in the conversation. When Defendant asked, "Do you think this is her NYC apartment?" Dordi responded, "Yes it is the apartment. Looks like streeteasy pics." (*Id.*).

42. This exchange confirms that the participants understood that the harvested images were being collected for use in the defamatory website.

### B. Copyright Knowledge

43. These photographs are the subject of Plaintiff's United States Copyright Registrations (VA 2-499-720, VA 2-450-298, and VA 2-450-299) and are protected works.

44. At his July 10, 2025 deposition, Defendant admitted that Plaintiff "never gave him written authorization" and that he "got it from the internet" because "it is public." (**Ex. O** at 77:12). The counsel mentioned that he can confirm that some of these pictures are not on the internet and indeed they were not. However, Plaintiff continued to lie under the

oath and carry on saying he cannot recollect how he got it. From the exhibit P it is quite clear that he stole the pictures from Plaintiff's personal social media account.

45. Copyright protection attaches regardless of a work's visibility on the internet. Defendant's testimony establishes that he knew the photographs were Plaintiff's, that Plaintiff did not authorize their use, and that he nonetheless reproduced them in his defamatory content.

46. Defendant, Sarkar, or Dordi was connected to Plaintiff on LinkedIn, they had in fact been blocked, and they created fake LinkedIn accounts and stalked Plaintiff to access and harvest the photographs and then disseminate those photographs for their use.

## IV. WILLFUL COPYRIGHT INFRINGEMENT AND AWS NOTICES

### A. First AWS Notice (2025): Defendant Complies

47. In early 2025, Amazon Web Services issued AWS Abuse Report #54135586152, notifying Defendant that photographs on the site infringed Plaintiff's registered works. A further notice was issued in July 2025, accompanied by copyright certificates. (**Ex. Q**).

48. Defendant complied in July 2025 by removing the originally-posted photographs, but then replaced them with different photographs he had previously harvested from Plaintiff's LinkedIn posts.

49. Defendant's compliance demonstrates that he understood he had no right to use the photographs and knew of the requirement to remove infringing content when notified.

### B. Second AWS Notice (October 2025): Defendant Refuses

50. In October 2025, Defendant received AWS Abuse Report #59191748137, a second copyright infringement notice concerning the Republished Website. (**Ex. R**).

51. Defendant refused to comply and instead asserted a "fair use" defense.

52. Fair use does not extend to the wholesale copying of copyrighted photographs for use in reputation-injuring content designed to harm the copyright holder.

53. Having previously complied with a takedown notice, Defendant's subsequent refusal, after demonstrating that he could comply and understood the requirement, evidences the willfulness of his continued infringement.

**C. Third Notice (April 2026): Continued Non-Compliance**

54. In April 2026, a further DMCA takedown notice was issued. Defendant again did not comply.

55. Defendant's compliance with the first notice, followed by his refusal to comply with subsequent notices, demonstrates that he knew he lacked authority to use the photographs yet continued the infringement with conscious disregard of Plaintiff's rights.

## V. DEFENDANT'S DEMANDS FOR PAYMENT DIRECTED INTO NEW YORK

56. On at least three separate occasions — on or about April 2025, June 2025, and particularly in January 22, 2026 Defendant sent written communications from his Proton Mail account (viral.bhagat@proton.me,)to Plaintiff, a New York resident, each demanding payment of $100,000 in exchange for removing the infringing, mark-bearing website. **(Ex. S**).

57. In the January 22, 2026 communication, Defendant wrote that "the cost is $100,000," that "[u]pon receipt of payment, all hosted materials will be taken down," and that otherwise "the site remains live." Defendant thereby attempted to consummate a commercial transaction with a New York resident concerning the mark-bearing domain, evidencing

both his bad-faith intent to profit within the meaning of the ACPA and his transaction of business directed into New York. (*Id.*).

## VI. MANIPULATION OF SEARCH RESULTS AND DIVERSION OF PLAINTIFF'S NEW YORK MARKET

### A. Strategic Metadata Design

58. Beyond the visible text and images, Defendant designed both websites to maximize their appearance in internet search results for Plaintiff's name and brand. The HTML source code contains metadata keywords selected for that purpose.

59. The metadata keywords embedded in the websites include, among others: "Anu Shah," "Anuja Shah," "The Talk Lane," "controversies," "lawsuits," "arrest," "eviction," "fraud," "hacking," and "harassment." (**Ex. C**) These keywords were selected to rank the defamatory site prominently in searches for Plaintiff's name and mark, so as to tarnish the brand, injure the enterprise, and harm Plaintiff's reputation. The defamatory sites are a cause of lost sponsorship and guest opportunities.

60. The page title ("Anu Shah's (The Talk Lane) Web of Lies") and the embedded keyword list directly and deliberately associate Plaintiff's name and mark with allegations of criminality and dishonesty in the search-engine index. (**Ex. C**)

### B. Comparison of Original and Republished Websites

| Element | Original Website (Jan. 2025) | Republished Website (July 2025) |
|---|---|---|
| Title | "Anu Shah's (The Talk Lane) Web of Lies: Arrest, Lawsuits, and False Claims" | "Anu Shah's (The Talk Lane) Troubled Story: Arrest, Lawsuits, and Fabricated Claims" |
| URL | thetalklane.s3-website-us-east-1.amazonaws.com | fraud-1.s3.us-east-1.amazonaws.com |
| "Arrested Feb. 14, 2024" | Present | Present |

| | | |
|---|---|---|
| "Fired from Meta for hacking" | Present | Removed |
| "Accused of not paying legal bills" | Present | Removed |
| Eviction allegations | Present (despite knowledge dues were paid) | Maintained |
| Hacking allegations (general) | Present | Maintained |
| FBI/FTC complaint references | Present (without disclosure) | Maintained |
| Curated docket hyperlinks | Four dockets | Maintained |
| Photographs | Original photos (VA 2-499-720, etc.) | Different photos (also unauthorized) |

61. The selective removal of the most clearly indefensible statements while maintaining others reflects Defendant's knowledge of which statements were most vulnerable to being proven false, and supports the inference of knowledge of falsity.

**C. Impact on Plaintiff's Business**

62. Defendant's metadata strategy was intended to ensure that anyone searching for Plaintiff's name, "The Talk Lane," or related terms would encounter the defamatory websites at or near the top of the search results.

63. The Talk Lane's business model depends on discovery through internet search by prospective sponsors, guests, investors, and clients seeking podcast-production services.

64. When such prospective partners search for "Anu Shah," "The Talk Lane," or related terms, they encounter Defendant's defamatory websites, which carry a warning to "exercise caution when dealing with Anu Shah, especially in business or personal matters."

65. The following is a non-exhaustive list of the false and defamatory statements published by Defendant on the websites and, where indicated, on Quora (**Ex. T**), each of which is false for the reasons stated:

(a) That Plaintiff was "arrested" in New York City on February 14, 2024 on assault charges. False: Plaintiff was not so arrested.

(b) That Plaintiff was "fired from Meta/Facebook" in January 2023 "for hacking into Jason Kothari's [F]acebook account." False: Meta made no such finding, and the hacking allegation is fabricated, as set forth in Sections III and XIII.

(c) That Plaintiff was "evicted twice" for non-payment of rent. False: any arrears were paid as a matter of public record, as Defendant knew and acknowledged that rent was paid Plaintiff lived there long after that (See Exhibit attached).

(d) That Plaintiff's "own attorneys … have accused her of not paying legal bills." False. (Attorney in question is being sued for Malpractice and collusion with Defendant. NY state supreme court index number 156429/2026. Plaintiff is following and tracking this closely currently)

(e) That Plaintiff is the subject of independent FBI and FTC "complaints" or investigations. False and misleading: Defendant himself filed the IC3 complaint, as he admitted. (**Ex. O** at 95:24-25, 96:1-3).

(f) That Plaintiff is a "fraud," that she "fake[s] her success," that she is a "gold digger," and that she is a "hacker." (**Ex. O**). False.

66. Defendant's manipulation of search results directly interferes with Plaintiff's ability to attract sponsors, guests, investors, and clients, and to build her enterprise. The lost StrtpBoost sponsorship opportunity (see exhibit attached), among others, exemplifies this concrete business harm.

## VII. THE HACKING ALLEGATIONS ARE FALSE

### A. Multiple Independent Sources

67. The defamatory statements attribute to Plaintiff false allegations of hacking, fraud, and intentional wrongdoing, most prominently that she "was fired from Meta/Facebook in January 2023 for hacking into Jason Kothari's facebook account." (**Ex. M**)

68. These allegations are false, and are shown to be false by multiple independent sources:

i. Dordi's own deposition testimony from September of 2025, in which he did not directly attribute the conduct to Plaintiff and stated he was unsure whether she hacked his account (**Ex. U**);

ii. The independent forensic analysis of Mr. Nate Zaugg, who found no technical basis to conclude that Plaintiff sent or was involved with the messages at issue (**Ex. V**); and

iii. Kothari's own statement suggesting he did not consider the Indian complaint reliable, together with Meta's records reflecting no finding of wrongdoing by Plaintiff (**Exs. W & X, HH**).

### B. Defendant's Knowledge

69. Defendant, Jason Kothari and Rushad Dordi had colluded to bring fake law suits against the Plaintiff (see Ex JJ) By August 2025, Defendant had access to Dordi's deposition testimony (which Defendant's counsel took), the forensic expert report, and Meta's account logs.

70. By October 2025, Defendant had also received notice of the June 30, 2025 dismissal of Dordi's claims, the settlement, and Dordi's discovery admissions. Additionally since May / June 2025 he is aware that Kothari had lied in his complaint (see exhibit LL)

71. Despite this knowledge, Defendant continued to publish the hacking allegations as fact, supporting the inference of actual malice.

## VIII. THE FBI/FTC COMPLAINT REFERENCES

### A. Defendant Admitted Filing the IC3 Complaint

72. The websites state: "Complaints have also been lodged against her with the FBI's Internet Crime Complaint Center (IC3) and the Federal Trade Commission (FTC)."

73. At his July 10, 2025 deposition, when asked how he had seen the referenced complaints, Defendant stated: "I filed it." Defendant filed the IC3 complaint himself. (**Ex. O** at 96:3)

74. Defendant further acknowledged that the IC3 portal accepts complaints from any member of the public without verification or investigation, and that there is no means to verify the status or outcome of a complaint.

75. By publishing references to "complaints … lodged" without disclosing that he was the source, Defendant created the false impression that a government agency had independently investigated and found wrongdoing. Moreso as these are unverified self reported false conduct done to harm the reputation of the Plaintiff

### B. Dordi's Uncertainty

76. At his September 2025 deposition, Dordi testified: "I don't recall on my own filing such a complaint or a notification. It's possible that I may have. I don't recall off the top of my mind right now." (**Ex. U** at 148:1-3).

77. Dordi's inability to recall filing a complaint is inconsistent with the website's assertion that complaints "have been lodged."

### C. Defendant's Own Assessment

78. Defendant has no copy or receipt of the complaints he claims were filed and no knowledge of any outcome. (**Ex. O** at 95–98.) This is consistent with the complaints having resulted in no action, investigation, or finding, notwithstanding Defendant's publication of references designed to imply governmental concern.

## IX. THE DISSEMINATION CAMPAIGN

### A. Distribution to Journalist Michael Balter

79. Defendant disseminated the defamatory website links to persons within Plaintiff's professional network, including journalists and prospective business partners.

80. Michael Balter, a journalist for the Croton Chronicle, confirmed receiving the Original Website URL on April 5, 2026, from Defendant or someone acting on his behalf. (**Ex. J**).

81. This distribution was designed to amplify the reach of the defamatory content and to ensure that internet searches would surface the defamatory websites.

### B. Distribution to Business Contacts

82. The defamatory website links were disseminated to several of Plaintiff's professional connections and past podcast guests, in order to warn prospective sponsors against engaging with Plaintiff, interfere with her ability to attract guests, and damage her professional reputation. The conduct was done in association with Tat Sarkar by creating fake LinkedIn accounts and find her professional network and disseminate to them to harm her business and livelihood. (See Ex. MM)

### C. Sarkar's Anonymous Dissemination Strategy

83. In the August 2024 planning conversation, Sarkar proposed sending defamatory information to Plaintiff's LinkedIn contacts from untraceable sources: "No existing technology will be able to connect me to those messages that her contacts on linkedin receive." (**Ex. H** at CTRL_00005001).

84. This evidence proves the defamation and tortious interference with Plaintiff's prospective business relationships.

## X. COORDINATED SOCIAL-MEDIA HARASSMENT AND FAKE ACCOUNTS (Ex. P)

### A. Pattern of Fake LinkedIn Profiles

85. Plaintiff blocked Defendant, Sarkar, Dordi, and Kothari in 2022–23. Over approximately three years (2023–2026), and as identified in Exhibit P, fake LinkedIn profiles were created and operated to monitor Plaintiff's professional network, harvest photographs without authorization, conduct coordinated harassment, and send unsolicited messages.

86. In January 2024, Plaintiff reported a fake LinkedIn profile to LinkedIn's safety team, stating: "It is shameful that I go through this repeatedly. These accounts are created by Rushad Dordi … and / or Viral Bhagat … I have been told this multiple times and yet there has been no action taken by LinkedIn … in stopping these … from creating multiple accounts through the same device or IP address." (**Ex. Y**).

87. LinkedIn assigned Case No. 240130-022264 to its Safety Team for investigation of the coordinated fake-account activity.

**B. Specific Fake-Account Examples**

88. Vishnu Reddy Profile: In May 2026, Plaintiff reported this profile; LinkedIn addressed it as part of the coordinated activity.

89. John Frank Profile: In May 2026, Plaintiff reported this account for sending unsolicited harassing messages.

90. Charles Chamberlain Profile: Plaintiff's LinkedIn records reflect communications on January 29–30, 2024 in which the account operator referenced the creation of multiple accounts.

91. Plaintiff's LinkedIn blocked-accounts log reflects approximately 20–30 additional blocked fake profiles created over a multi-year period, establishing a systematic pattern of account creation and recreation designed to evade platform enforcement.

**C. Picture Harvesting Through Fake Profiles**

92. The fake LinkedIn profiles served as vehicles for unauthorized picture harvesting. The August 28–29, 2024 conversation shows Defendant requesting: "Could you please download all the pictures from this post and send them to me?" (**Ex. P** at CTRL_00004990).

93. Sarkar transmitted a ZIP archive titled "anushah.zip" (6 MB) containing photographs harvested from Plaintiff's LinkedIn profile without authorization. These photographs were incorporated into the defamatory websites published in January 2025.

94. The fake accounts enabled the participants to access, monitor, download, and use Plaintiff's professional photographs amounting to copyright infringement.

**D. Quora Defamation Campaign**

95. Defendant created and operated a Quora account under the username "Samuel Olyphant," through which he published defamatory questions and content referencing Plaintiff by name and by her registered mark "The Talk Lane."

96. Quora's records confirm that the user "Samuel Olyphant" is Viral Bhagat (viral.bhagat@gmail.com). In its response dated May 7, 2026, Quora's User Operations team stated: "The account Samuel Olyphant is also banned from our platform. In addition the account associated with it, with email address viral.bhagat@gmail.com has also been disabled and banned from our platform." (**Ex. Z**).

97. Between February and March 2026, using this account, Defendant published defamatory questions including:

i. "Was Anu Shah fired from Meta for hacking multiple Facebook and Instagram accounts?"

ii. "Is Anu Shah of The Talk Lane a fraud?"

iii. "Why does Anu Shah of Talk Lane fake her success?"

iv. "Is Anu Shah a gold digger?"

v. "Is Anu Shah of The Talk Lane a hacker?" (*See* **Ex. T**)

98. Each question falsely implicates Plaintiff in criminal or dishonest conduct, invokes her mark in a defamatory context, and was designed to appear in search results for her name and brand.

99. Quora removed the content and permanently banned Defendant's account, consistent with a violation of its policies regarding defamation, harassment, and misuse of identity.

100. In or around December 2025, Plaintiff received abusive emails from samuel.olyphant@gmail.com, using the same alias and language associated with the prior harassment, containing degrading, gender-based remarks about Plaintiff, her family, and The Talk Lane. (**Ex. AA**)

101. These emails were also sent to individuals in Plaintiff's personal and professional circles, amplifying their reputational and emotional impact.

102. Based on the timing, content, and use of the same alias, this communication was part of the coordinated harassment campaign.

**E. Summary of Multi-Platform Conduct**

103. The evidence establishes a coordinated, multi-platform harassment and surveillance campaign spanning three years, including the creation of numerous fake LinkedIn profiles (2023–2026), the publication of defamatory Quora content (2024–2026), the hosting of defamatory websites (2025), and coordinated planning to disseminate defamatory material to Plaintiff's professional network (2024).

104. Each of LinkedIn, Quora, and AWS took enforcement action in response to this conduct including LinkedIn's Safety Team investigation, Quora's removal and ban of Defendant's account, and AWS's issuance of copyright infringement notices.

## XI. DEFENDANT'S MOTIVE: ROMANTIC REJECTION (JANUARY–MAY 2023)

**A. No Prior Relationship**

105. Defendant is a love sick suitor as confirmed in his own word. (Se Ex. NN) Before January 2023, Defendant had no relationship with Plaintiff of any kind. Defendant sent Plaintiff a LinkedIn connection request in February 2021, which Plaintiff accepted among

her 3,500+ professional connections. The parties never communicated through LinkedIn or any other medium before 2023.

**B. First Contact and Repeated Meeting Requests**

106. On January 19, 2023, Defendant initiated WhatsApp contact with Plaintiff. When Defendant revealed that he worked at Meta and that the parties had connected on LinkedIn in 2021, Plaintiff responded: "No I don't know that." Defendant immediately proposed an in-person meeting in California. Plaintiff declined, stating that she was based in New York and would not be visiting the Bay Area soon. (**Ex. E** at CTRL_00008976).

107. On January 31, 2023, Plaintiff further clarified her position: "There is no pressure from my end for you to make a trip especially to meet me in New York." Defendant acknowledged: "Got it. Thanks." (**Ex. BB**).

108. In May 2023, when Defendant was visiting New York, he repeatedly insisted on meeting Plaintiff for coffee and breakfast. Plaintiff declined all requests. Plaintiff and Defendant never met in person. (**Ex. CC**)

**C. The Rejection That Precipitated the Campaign**

109. Over the four-month period from January to May 2023, Defendant made multiple in-person meeting requests that Plaintiff consistently and clearly declined. Plaintiff never expressed any romantic interest in Defendant.

110. By mid-2023, Defendant had experienced both professional difficulty and romantic rejection by Plaintiff. Upon information and belief, this combination motivated Defendant's subsequent sustained campaign to harm Plaintiff's reputation and business.

## XII. DORDI'S RELATIONSHIP WITH PLAINTIFF AND HIS FABRICATED ACCUSATIONS

### A. The Relationship (October 2018 – March 2021)

111. Rushad Dordi first met Plaintiff in October 2018. From October 2018 through mid-2020 they maintained a friendship. In June 2020, Dordi professed romantic interest, and Plaintiff agreed to give the relationship a chance.

112. The relationship deteriorated. In early 2021, Plaintiff discovered that Dordi maintained multiple active dating profiles and had engaged in deceptive conduct toward multiple women. By March 2021, Plaintiff ended the relationship.

113. When Plaintiff ended the relationship, Dordi responded with pleas and threats of self-harm.

### B. Two-Year Harassment Campaign (2021–2023)

114. After Plaintiff ended the relationship in 2021, Dordi engaged in a sustained campaign of harassment, including stalking her social media, creating fake LinkedIn accounts, and sending burner-phone threats.

### C. Fabrication of the False Hacking Allegation

115. The cornerstone of Dordi's campaign was a false allegation that Plaintiff had hacked his Instagram account and posted messages from it. This fabricated allegation later became a primary basis for Defendant Bhagat's defamatory publications.

116. At his September 2025 deposition, Dordi's allegation was undermined by his own testimony:

    i. "I certainly have not seen her log into my account in person."

    ii. "I have not seen her physically with a device while logged into my Instagram account."

iii. Asked whether he had "any forensic evidence tying Ms. Shah to the 2023 hack," Dordi identified none (**Ex. U** at 117:9–12), and he confirmed he had never seen any video of Plaintiff logging into or using the account (*Id*. at 141:1–3). When asked whether he was certain Plaintiff hacked his account, he described a conclusion he had reached "after interpreting the evidence," and when asked whether he was "a hundred percent sure," he answered, "I think it's highly likely." (*Id*. at 139:3–11.) The only basis he articulated for his belief was that posts on the account "would strongly mimic" messages he attributed to Plaintiff and to "various burner numbers which I believe were in her control" (*id*. at 118:10–16), the same burner-number attribution that the independent forensic analysis found no technical evidence to support. Dordi's accusation thus rests entirely on his own inference from circumstances, not on any direct or forensic evidence.

**D. Dordi's Own Account Logs**

117. Meta's internal account logs reflect that Dordi maintained control of his own account, and show a pattern consistent with deliberately staging a compromise:

i. April 18, 2023: recovery email changed to "rusahdkdordi2023@gmail.com";

ii. April 21–22, 2023: cycling among variants of the same address; and

iii. May 18, 2023: the recovery email changed three times in under three hours — 9:57 a.m. ("rushed.dordi@gmail.com"), 12:00 p.m. ("rusahdkdordi2023@gmail.com"), and 12:54 p.m. ("rushad.dordi@gmail.com"). (**Ex. DD**)

118. This pattern is consistent with a person in control of the account deliberately manipulating recovery settings to create the appearance of unauthorized access, rather than the behavior of a victim of an external hack.

**E. Dordi's Fabricated Instagram "Evidence"**

119. To support his hacking claim, Dordi produced screenshots purportedly showing messages posted from his account. Upon information and belief, these images were composed in Instagram's "Create Mode," which generates locally-stored draft images rather than server-published content.

120. Screenshots taken from Create Mode contain no server timestamps, post IDs, or source metadata. Dordi's screenshots exhibited these hallmarks, indicating they were self-authored mock-ups rather than proof of published content.

**F. The Gmail Account**

121. Dordi claimed that the Gmail account "rusahdkdordi2023@gmail.com" belonged to an unknown hacker. During discovery, when Google prepared to release subscriber records in response to a subpoena, the account's recovery notice was directed to Dordi's personal email address, rushad.dordi@gmail.com, suggesting that the account Dordi attributed to a "hacker" was his own. (**Ex. EE**)

122. This evidence indicates that the hacking narrative was fabricated and that the allegations that Plaintiff had hacked Dordi's account were false.

**G. Dordi's Inconsistent Sworn Statements**

123. Dordi's sworn characterization of his relationship with Plaintiff varied across forums: "only platonic" (Verified Complaint, State Court, 2023) (**Ex. FF**); "generally platonic"

with a single "intimate encounter" (**Ex. U**); and he testified in family court that he had a "former intimate relationship" with Plaintiff. (**Ex. FF**).

124. These shifting sworn characterizations undermine Dordi's credibility.

**H. Forensic Expert Analysis**

125. A forensic expert, Mr. Nate Zaugg of Mindfire Tech, reviewed carrier and platform metadata and concluded: "Based on a review of carrier and platform metadata, I found no technical evidence linking the burner phone numbers or anonymized messages at issue to the Defendant … there is no technical basis to conclude that Ms. Shah sent or was involved with the messages at issue." (**Ex. V**)

**I. Dordi's Lawsuit and Its Resolution**

126. Dordi filed a complaint (Index No. 161221/2023) in New York State Supreme Court alleging, among other things, defamation and intentional infliction of emotional distress based on the hacking allegations.

127. By Order dated June 30, 2025, the Honorable David B. Cohen, J.S.C., dismissed most of Dordi's claims. (**Ex. GG**)

128. After Plaintiff asserted counterclaims, including for intentional infliction of emotional distress, civil conspiracy, and defamation, the parties settled.

129. Defendant received formal notice of this settlement and dismissal. Despite that notice, Defendant continued to publish the Dordi case docket (Index No. 161221/2023) on his Republished Website without any disclosure of the dismissal or settlement, evidencing bad faith.

## XIII. KOTHARI'S PURSUIT OF PLAINTIFF AND SUBSEQUENT RETALIATION

### A. Professional Mentorship (2019–2020)

130. Plaintiff met Jason Kothari in late 2019 or early 2020 in a professional context. Kothari served as a mentor, and Plaintiff engaged in regular mentorship conversations with him via video call approximately every other week through late 2021.

### B. Matrimonial Overtures and Retaliation (December 2020 – April 2021)

131. In December 2020, Kothari introduced Plaintiff to Preeti Rathi Gupta, who stated in Plaintiff's presence: "now our agenda is to get you guys married."

132. Over the following months, Ms. Gupta inquired about Plaintiff's relationship status, consistent with monitoring Plaintiff's romantic availability on Kothari's behalf.

133. After the introduction, Ms. Gupta offered Plaintiff a consulting contract; but in March or April 2021, when Plaintiff indicated she was considering a family marriage proposal, Ms. Gupta cancelled the contract.

134. Around June 2021, after learning the marriage proposal had not proceeded, Ms. Gupta offered Plaintiff a full-time role, which Plaintiff declined, having secured a position at Meta.

### C. Pursuit Through Matrimonial Services (July–August 2021)

135. In or around July or August 2021, Kothari's profile appeared through the Corporate Marriage Bureau matrimonial portal, and Kothari and Plaintiff were introduced. Kothari insisted that Plaintiff meet him in San Francisco or London.

136. When Plaintiff declined, a burner phone number appeared claiming to be "in London" and able to meet Plaintiff in New York, timing that coincided with Kothari's discussions of London travel.

**D. Burner-Phone Harassment (2021)**

137. In 2021, Plaintiff and her family experienced sustained harassment via burner phone numbers, including threats and abusive language.

138. Given the timing, Plaintiff's mother engaged Salman Sarwer, founder of the Corporate Marriage Bureau, to investigate whether Kothari was involved.

139. Sarwer relayed his findings to Plaintiff and her mother, assisting Plaintiff in assessing the source of the harassment.

140. In April or May 2022, while traveling to Dubai, Kothari repeatedly asked Plaintiff to visit him there. Plaintiff declined.

**E. Kothari's Account Compromise and the Meta Inquiry (July–August 2022)**

141. In July or August 2022, Kothari's Facebook account experienced unauthorized access, and Kothari sought Plaintiff's assistance.

142. Kothari escalated the matter to Ajit Mohan, Meta's Managing Director for India. Meta's internal records reflect no finding of wrongdoing by Plaintiff, and Kothari was so informed. (**Ex. HH**).

**F. Formal Complaint and Police Inquiry (September–December 2022)**

143. In September or October 2022, Plaintiff's late father filed a formal complaint with the Malabar Police Station in India documenting the harassment and naming Rushad Dordi and Jason Kothari as suspects.

144. In December 2022, Plaintiff met with Mumbai police investigators and provided additional evidence.

145. Police investigators interviewed Kothari regarding the harassment in December 2022 and January 2023.

**G. Kothari's Retaliatory FIR (January 2023)**

146. After being interviewed, Kothari filed a First Information Report (FIR) against Plaintiff in India in January 2023, attempting to attribute his account compromise to Plaintiff.

**H. Kothari's Own Admission (September 2024)**

147. In a September 2024 WhatsApp message to Defendant Bhagat (produced in discovery), Kothari acknowledged, in reference to the Indian complaint, "I think she bribed the Indian police." (**Ex. II**),

148. This statement indicates that Kothari himself did not regard the Indian complaint as reliable, and that there was no clear evidence tying Plaintiff to his account compromise.

**I. No Litigation by Kothari**

149. Kothari never filed any lawsuit against Plaintiff in India or the United States, and the FIR produced no charges or court proceedings. The only public references to the FIR are those on Defendant's and Dordi's defamatory websites.

## XIV. THE COORDINATED CAMPAIGN (DECEMBER 2023)

**A. December 9–10, 2023: Coordination**

150. In a WhatsApp group conversation on December 9–10, 2023, among Defendant Bhagat, Rushad Dordi, and Jason Kothari, the participants discussed a strategy to multiply litigation against Plaintiff and to use that litigation and related publicity to damage her reputation and restrict her ability to seek employment. (**Ex. JJ**)

151. Dordi wrote (December 9, 2023): "I've served her papers formally. As of last week. Any process you can re-initiate in the United States or India will likely be mutually beneficial."

152. Defendant responded (December 9, 2023): "+1 … I think something in India will be great. She has enough legal problems in the USA. Rushad and I are suing her. Her landlord is also suing her." (*Id.*)

153. Dordi described the objective as restricting Plaintiff's geographic mobility and stated: "The more fronts we hit her on the better we will all be." (*Id.*).

154. When Kothari asked about the end goal, Dordi wrote: "Because if she has lawsuits filed and won against her in a certain place, she is going to have a hard time finding employment or living in that place." (*Id.*).

155. This conversation evidences Defendant's intent to injure Plaintiff's employment opportunities and reputation through coordinated action.

**B. December 13, 2023: The Plan to Publish Online**

156. On December 13, 2023, Defendant wrote: "We should also put something online so that people googling her name can learn about all the legal actions against her."

157. Kothari concurred: "The article would be online as well and could serve this purpose too."

158. Dordi added: "They reached out when my lawsuit was posted online. They probably look for good stories prospectively."

159. This December 13, 2023 exchange, more than a year before the Original Website was published in January 2025, evidences Defendant's pre-existing intent to create online content designed to appear in search results for Plaintiff's name.

## XV. THE AUGUST–SEPTEMBER 2024 PLANNING SESSION

### A. The Planning Conversation

160. In an extended WhatsApp conversation spanning August 28–29 and September 3, 2024, Defendant engaged in detailed planning with Tathagata Sarkar regarding the creation and publication of the defamatory website. This conversation, produced by Defendant in discovery, reflects Defendant's knowledge and intent.

### B. Stated Intent to Destroy Plaintiff's Livelihood

161. Sarkar proposed creating a website designed to appear in search results: "Buy a domain … we can build a full case and evidence there. Anybody who searches for her, will find the website. She will have zero ability to earn a living. She will have zero ability to get a serious date." (**Ex. H** at CTRL_00005001).

162. This statement articulates an intent to weaponize search results to injure Plaintiff's employment prospects and personal relationships.

### C. Knowledge of Falsity: The Eviction Allegations

163. Defendant and Sarkar discussed Plaintiff's landlord matters with contemporaneous knowledge that any arrears had been paid. Sarkar asked: "These eviction filings are from 2023. What's the status now?" Defendant responded (August 28, 2024): "We believe she paid off the dues and somehow managed to keep the apartment. We are not sure though … that apartment is not listed back on the market. so we believe she is still living there." (**Ex. H**).

164. Defendant thus knew, as he planned the website, that Plaintiff had "paid off the dues" and "managed to keep the apartment."

165. Defendant nonetheless published statements characterizing Plaintiff as having faced eviction due to non-payment of rent — statements Defendant knew to be false or materially misleading.

**D. Knowledge of Falsity: The FBI Complaint**

166. Regarding the FBI complaint, Defendant stated (August 28–29, 2024): "We have reached out to FBI but they are not very excited about this … this didn't have any major impact on the society."

167. This statement is an acknowledgment that the complaint was not serious and would result in no action or findings.

168. Defendant nonetheless later published assertions that "[c]omplaints have also been lodged against her with the FBI's Internet Crime Complaint Center (IC3)," creating the false impression that a government agency had independently investigated and found wrongdoing.

169. Defendant testified that, despite his allegations that both he and Dordi had filed FBI complaints, he neither retained a copy of his own complaint nor recalled seeing Dordi's, yet asserted that both had been filed. (**Ex. O** at 96–99.)

170. Dordi testified that he did not recall whether he filed any FBI IC3 or FTC complaint; his counsel characterized the testimony as: "He just said he doesn't recall if they were or were not filed." (**Ex. U** at 160:6–9.)

**E. "We Prefer a Clean Job"**

171. Sarkar proposed disseminating defamatory material through anonymous, untraceable channels: "The defamation will happen from anonymous sources … you or Rushad will not have any evidence of how and where and when I am sending the full information to

all her contacts. No existing technology will be able to connect me to those messages that her contacts on linkedin receive."

172. Defendant endorsed this approach, stating: "we prefer a clean job." (**Ex. H** at CTRL_00005001).

173. Defendant's endorsement reflects an intent to disseminate defamatory content to Plaintiff's professional network while concealing its source, so as to create the false impression of multiple independent sources.

174. This evidences conspiracy to defame and intentional interference with Plaintiff's business relationships.

### F. The "Jealous Love-Bitten Suitor" Warning

175. On September 3, 2024, Sarkar warned Defendant: "You do not have enough content. While I and Rushad know that you are right, you can be easily dismissed as a jealous love-bitten suitor whose ego got wounded and now trying to malign her name." (**Ex. H** at CTRL_00004986).

176. Sarkar added: "But, as of now, you are just a lovesick suitor who was never important, anyway (in her version of the story)." (*Id.*)

177. Defendant did not dispute this characterization.

178. Defendant's conduct reflects awareness that his planned publications were improper and motivated by personal animus rather than legitimate reporting.

## XVI. FURTHER EVIDENCE OF DEFENDANT'S INTENT

179. Defendant's documented communications further evidence his specific intent to defame and injure Plaintiff. In addition to the statements quoted above, the WhatsApp communications produced in discovery reflect Defendant and his associates planning to

"put something online so that people googling her name can learn about all the legal actions against her"; agreeing to "buy a domain" so that "[a]nybody who searches for her, will find the website" and "[s]he will have zero ability to earn a living"; and endorsing a "clean job" by which defamatory material would be disseminated from anonymous sources. (**Ex. H** at CTRL_00005001).. These communications are reproduced in the referenced exhibits.

## XVII. DEFENDANT'S RECEIPT OF NOTICE AND CONTINUED PUBLICATION

### A. Formal Notice of Falsity

180. In October 2025, Defendant received formal notice that Dordi had settled his state-court case on June 30, 2025; that Dordi paid Plaintiff a sum pursuant to a settlement agreement; and that Dordi agreed to a Stipulation of Dismissal with prejudice.

181. This resolution reflected that Dordi's core hacking allegation was legally insufficient and factually unsupported.

### B. Continued Publication After Notice

182. Despite this notice, Defendant continued to publish the Dordi case docket (Index No. 161221/2023) on his Republished Website without disclosing the dismissal, settlement, payment, or non-disparagement agreement.

183. This continued publication after notice reflects a knowing misrepresentation of litigation status, bad faith, and the continuation of defamation after notice that the underlying allegation was unsupported.

## XVIII. INJURY AND DAMAGES

### A. Loss of Income and Enterprise Value

184. The emotional and psychological impact of Defendant's conduct caused Plaintiff to take medical leave from her position at Amazon under the Family and Medical Leave Act from March 2025 through September 2025.

185. During that period, Plaintiff received only 60% of her ordinary compensation, resulting in calculable lost wages during a critical growth period for The Talk Lane.

186. Plaintiff also lost specific, demonstrable sponsorship opportunities for The Talk Lane and experienced guest cancellations as a result of Defendant's conduct.

### B. Medical and Psychiatric Treatment

187. From March 2025 through December 2025, Plaintiff was under the care of Dr. Mekeles in New York for treatment of anxiety and depression attributable to Defendant's conduct, including medication management. Plaintiff thereafter continued treatment with Dr. Sandip Shah, a psychiatrist, and remains in treatment as of the filing of this Complaint.

188. The lost sponsorship opportunity with StrtpBoost — a commercial arrangement in active negotiation in September 2025 — was not finalized after prospective partners encountered Defendant's defamatory websites in due diligence, exemplifying concrete, measurable business harm.(**Ex**. **KK**).

189. The continuing presence of the Republished Website online, accessible to prospective partners, investors, guests, and sponsors, maintains this injury on an ongoing basis.

## CLAIMS FOR RELIEF

### FIRST CLAIM — CYBERSQUATTING
### (15 U.S.C. § 1125(d) / ACPA)

190. Plaintiff repeats and re-alleges each preceding paragraph as if fully set forth herein.

191. Plaintiff owns all rights in the Mark, which was distinctive at the time Defendant registered and used the infringing domain identifier.

192. Defendant registered and used the alphanumeric designation "thetalklane" as part of an internet address that is identical or confusingly similar to the Mark.

193. Defendant acted with a bad-faith intent to profit from the Mark. Among other indicia of bad faith under 15 U.S.C. § 1125(d)(1)(B)(i): Defendant has no intellectual-property rights in the Mark; the domain does not consist of Defendant's name; Defendant made no bona fide noncommercial or fair use of the Mark; Defendant intended to divert consumers from Plaintiff's online location for commercial gain and to tarnish the Mark; and — as set forth in the Jurisdiction section and incorporated herein — Defendant repeatedly offered to cease hosting the mark-bearing site in exchange for payment of $100,000, an offer to relinquish the domain for financial gain within the meaning of 15 U.S.C. § 1125(d)(1)(B)(i)(VI).

194. Defendant's repeated monetary demands, and his commercial exploitation of the Mark to divert Plaintiff's audience, further establish that Defendant could not have reasonably believed that his use of the domain was a lawful or fair use, and the statutory safe harbor of 15 U.S.C. § 1125(d)(1)(B)(ii) is therefore unavailable.

195. Defendant's conduct violates the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d). Plaintiff is entitled to injunctive relief, transfer or cancellation of the infringing identifier, and, at her election, statutory damages under 15 U.S.C. § 1117(d).

As a direct and proximate result of Defendant's cybersquatting, Plaintiff has suffered damages, including the diversion of the audience, sponsors, and prospective guests searching for Plaintiff's enterprise, lost sponsorship and business opportunities, and injury to the goodwill associated with the Mark. Plaintiff is entitled to recover her actual damages and Defendant's profits under 15 U.S.C. § 1117(a) or, at her election, statutory damages of up to $100,000 per domain name under 15 U.S.C. § 1117(d), together with transfer or cancellation of the infringing domain identifier and injunctive relief.

As a direct and proximate result of Defendant's cybersquatting, Plaintiff has suffered damages, including the diversion of the audience, sponsors, and prospective guests searching for Plaintiff's enterprise, lost sponsorship and business opportunities, and injury to the goodwill associated with the Mark. Plaintiff is entitled to recover her actual damages and Defendant's profits under 15 U.S.C. § 1117(a) or, at her election, statutory damages of not less than $1,000 and up to $100,000 per domain name under 15 U.S.C. § 1117(d), together with transfer or cancellation of the infringing domain identifier and injunctive relief.

**SECOND CLAIM — COPYRIGHT INFRINGEMENT**
**(17 U.S.C. § 501 *et seq.*)**

196. Plaintiff repeats and re-alleges each preceding paragraph as if fully set forth herein.

197. Plaintiff is the author and exclusive owner of original photographic works registered with the United States Copyright Office, including Reg. Nos. VA 2-499-720, VA 2-450-298, and VA 2-450-299 (the "Photographs").

198. Plaintiff has not granted Defendant any license or right to use the Photographs, nor assigned any exclusive right to Defendant.

199. Without authorization, Defendant copied, reproduced, and publicly displayed the Photographs on the Infringing Websites.

200. Following copyright takedown notices from AWS in 2025, Defendant temporarily removed certain Photographs but then re-infringed by uploading a different set of Plaintiff's copyrighted Photographs. Despite further notices in October 2025 and 2026, Defendant remained non-compliant.

201. Defendant's reproduction and display of the Photographs constitutes willful copyright infringement, as evidenced by his compliance with the initial notice followed by his refusal to comply with subsequent notices.

202. As a direct and proximate result, Plaintiff has suffered damages. For willful infringement, Plaintiff is entitled, at her election, to statutory damages under 17 U.S.C. § 504(c) of up to $150,000 per work infringed, together with permanent injunctive relief. The number of works and the corresponding statutory award shall be established at trial.

**THIRD CLAIM — TRADEMARK INFRINGEMENT**
**(15 U.S.C. § 1114 / Lanham Act § 32)**

203. Plaintiff repeats and re-alleges each preceding paragraph as if fully set forth herein.

204. Plaintiff, as owner of the Mark, has standing to maintain an action for infringement under 15 U.S.C. § 1114.

205. Defendant was aware that Plaintiff owns the Mark and did not obtain consent to use it.

206. Defendant knowingly used the Mark, and colorable imitations of it, in the HTML metadata, URLs, and titles of the Infringing Websites to manipulate search-engine results.

207. Defendant's use has caused actual confusion, as evidenced by the reports of New York sponsors who encountered the Infringing Website in place of Plaintiff's official site, thereby diverting consumers from Plaintiff's legitimate business.

208. Defendant's continued, knowing, and intentional use of the Mark without consent constitutes infringement in violation of § 32 of the Lanham Act, 15 U.S.C. § 1114, entitling Plaintiff to actual damages and Defendant's profits under 15 U.S.C. § 1117(a), together with injunctive relief.

In addition, As a direct and proximate result of Defendant's infringement of the Mark, Plaintiff has suffered damages, including the diversion of consumers and prospective sponsors from Plaintiff's official website, actual confusion among New York sponsors, lost sponsorship and guest opportunities, and injury to the goodwill and reputation associated with the Mark. Plaintiff is entitled to recover Defendant's profits, her actual damages, and the costs of the action under 15 U.S.C. § 1117(a); to enhancement of the award of up to three times actual damages in view of the knowing and intentional character of Defendant's conduct; and to injunctive relief under 15 U.S.C. § 1116.

**FOURTH CLAIM — FALSE DESIGNATION OF ORIGIN, PASSING OFF, AND UNFAIR COMPETITION**
**(15 U.S.C. § 1125(a) / Lanham Act § 43(a))**

209. Plaintiff repeats and re-alleges each preceding paragraph as if fully set forth herein.

210. The Mark is inherently distinctive and/or has acquired distinctiveness.

211. Defendant knowingly used false designations of origin by using the Mark to create a false implication of affiliation, sponsorship, or authorization by Plaintiff.

212. Defendant used the Mark to tarnish Plaintiff's business reputation by associating it with baseless criminal accusations and an express "exercise caution" warning aimed at deterring commercial counterparties.

213. Defendant's conduct was knowing, deliberate, and intended to trade on or destroy the goodwill of Plaintiff and her brand.

214. As a direct and proximate result, Plaintiff has been deprived of the value of the Mark and has suffered injury, entitling her to actual damages and Defendant's profits under 15 U.S.C. § 1117(a), together with injunctive relief.

**FIFTH CLAIM — TRADEMARK COUNTERFEITING**
**(15 U.S.C. §§ 1114(1)(a)–(b), 1116(d), 1117(b)–(c))**

215. Plaintiff repeats and re-alleges each preceding paragraph as if fully set forth herein.

216. Plaintiff is the owner of all right, title, and interest in the "The Talk Lane" mark (the "Mark").

217. Without Plaintiff's authorization, Defendant reproduced and used a mark identical to the Mark as the S3 identifier ("thetalklane") and in the titles and metadata of the Infringing Websites.

218. Defendant used the Mark in commerce with the intent to capture internet search traffic associated with Plaintiff's enterprise, thereby diverting prospective clients, guests, and consumers.

219. Defendant's use is likely to cause confusion, mistake, or deception as to the origin, sponsorship, or affiliation of the Infringing Websites.

220. Defendant was aware that Plaintiff owns the Mark, did not seek or obtain authorization to use it, and knowingly used the Mark or a colorable imitation thereof.

221. Defendant's conduct constitutes willful counterfeiting in violation of 15 U.S.C. §§ 1114(1)(a)–(b), 1116(d), and 1117(b)–(c), entitling Plaintiff, at her election, to statutory damages under 15 U.S.C. § 1117(c), together with injunctive relief and reasonable attorneys' fees.

As a direct and proximate result of Defendant's use of a counterfeit of the Mark, Plaintiff has suffered damages, including diverted search traffic, lost business opportunities, and

injury to the distinctiveness and goodwill of the Mark. Plaintiff is entitled, at her election, to statutory damages under 15 U.S.C. § 1117(c) of up to $200,000 per counterfeit mark per type of services offered or, the use having been willful, up to $2,000,000 per counterfeit mark, or alternatively to treble damages or profits under 15 U.S.C. § 1117(b), together with injunctive relief.

**SIXTH CLAIM — TRADEMARK DILUTION BY TARNISHMENT**
**(N.Y. Gen. Bus. Law § 360-l)**

222. Plaintiff repeats and re-alleges each preceding paragraph as if fully set forth herein.

223. The Mark is distinctive and protected under N.Y. Gen. Bus. Law § 360-l.

224. Defendant willfully used the Mark in connection with defamatory content designed to tarnish the Mark by associating it with criminal accusations and warnings to avoid doing business with Plaintiff.

225. This tarnishment has diminished the brand value and distinctive character of the Mark.

226. Plaintiff is entitled to preliminary and permanent injunctive relief under N.Y. Gen. Bus. Law § 360-l and, by reason of Defendant's willful and bad-faith conduct, to actual damages in an amount to be determined at trial.

**SEVENTH CLAIM — DEFAMATION**
**(New York Common Law)**

227. Plaintiff repeats and re-alleges each preceding paragraph as if fully set forth herein.

228. Defendant published, and caused to be published, false and defamatory statements of fact concerning Plaintiff to third parties, including through the creation, hosting, and promotion of the Infringing Websites and the Quora account operated under the pseudonym "Samuel Olyphant."

229. The defamatory statements include, without limitation, the statements enumerated above, namely that Plaintiff: (a) was evicted twice for non-payment of rent; (b) hacked into a social-media account and was fired from Meta; (c) faces accusations of fraud and harassment; (d) has a history of fraudulent claims; and (e) is the subject of independent FBI and FTC investigations.

230. These statements are false. Plaintiff paid her rent; Meta found no wrongdoing regarding the alleged hacking; the civil accusations were dismissed or are fabricated; and Defendant admitted filing the FBI complaint himself.

231. Defendant published these statements with actual malice — that is, with knowledge of their falsity or with reckless disregard for their truth or falsity — as evidenced by his contemporaneous communications and his continued publication after receiving notice of the statements' falsity.

232. Defendant's statements constitute defamation per se under New York law because they falsely accuse Plaintiff of serious crimes and tend to injure her in her trade, business, and profession.

233. As a direct and proximate result, Plaintiff has suffered injury to her personal and professional reputation, loss of business opportunities, humiliation, and economic damages in an amount to be determined at trial, but not less than $1,000,000.

## EIGHTH CLAIM — TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS
## (New York Common Law)

234. Plaintiff repeats and re-alleges each preceding paragraph as if fully set forth herein.

235. Plaintiff had prospective business relations with identifiable third parties, including the sponsorship relationship with StrtpBoost that was in active negotiation in September

2025, and prospective partnerships Plaintiff was exploring with Acceleration Partners and with Komodo (through Hype Marketing), each of which involved connecting content creators with brands for locally-produced, New York-centered content, as well as prospective podcast guests and sponsors.

236. Defendant had knowledge of Plaintiff's business and of her prospective business relations.

237. Defendant intentionally interfered with these relations through wrongful means, including defamation, trademark infringement, and the dissemination of anonymous defamatory materials to Plaintiff's professional network.

238. Defendant acted for the purpose of harming Plaintiff's ability to earn a living and injuring her enterprise.

239. As a direct and proximate result, Plaintiff suffered economic losses, including lost sponsorships and clients, lost audience growth, and diminished enterprise value, entitling Plaintiff to compensatory and punitive damages in an amount to be determined at trial, but not less than $500,000.

**NINTH CLAIM — INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(New York Common Law)**

240. Plaintiff repeats and re-alleges each preceding paragraph as if fully set forth herein.

241. Defendant's conduct, as alleged herein, was extreme and outrageous. Defendant organized and participated in a coordinated campaign involving surveillance, block-evasion through fake accounts, and the dissemination of defamatory materials to Plaintiff's peers.

242. Defendant engaged in this conduct intentionally and with the specific intent to cause, or with reckless disregard of a substantial probability of causing, severe emotional distress to Plaintiff.

243. As a direct and proximate result, Plaintiff has suffered severe, medically documented emotional distress, mental anguish, anxiety, and psychological trauma, entitling Plaintiff to compensatory and punitive damages in an amount to be determined at trial, but not less than $100,000.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment against Defendant and grant the following relief:

A. Awarding Plaintiff her actual damages based on lost sponsorship, lost revenue, lost viewership and Defendant's profits, together with the costs of the action, attorneys fees if any and any enhanced or treble damages available, for cybersquatting, trademark infringement, counterfeiting, false designation of origin, and unfair competition under 15 U.S.C. § 1117(a)–(b);

B. In the alternative, and at Plaintiff's election, awarding statutory damages for willful use of a counterfeit mark under 15 U.S.C. § 1117(c), of up to $2,000,000 per counterfeit mark per type of services offered, and statutory damages for cybersquatting under 15 U.S.C. § 1117(d), of not less than $1,000 and up to $100,000 per domain name;

C. Awarding Plaintiff her actual damages and any additional profits of Defendant attributable to copyright infringement under 17 U.S.C. § 504(b) or, at Plaintiff's election, statutory damages for each work infringed under 17 U.S.C. § 504(c), including enhanced

statutory damages of up to $150,000 per work infringed by reason of the willful character of the infringement, 17 U.S.C. § 504(c)(2);

D.Awarding Plaintiff compensatory and punitive damages for lost sponsorships, defamation, tortious interference with prospective business relations, and intentional infliction of emotional distress, in amounts to be determined at trial;

E.Awarding Plaintiff damages for injury to her reputation and standing resulting from Defendant's defamatory conduct;

F.Granting preliminary and permanent injunctive relief enjoining Defendant, and all those in active concert with him who receive notice of the injunction, from: (i) infringing, diluting, or tarnishing the Mark; (ii) using the Mark or any confusingly similar designation in any domain name, website, title, metadata, or content; (iii) using any false designation of origin or engaging in any act likely to cause confusion as to affiliation with or sponsorship by Plaintiff; (iv) publishing, hosting, or disseminating the Infringing Websites or their contents; (v) reproducing, displaying, or distributing Plaintiff's copyrighted Photographs; and (vi) destroying, concealing, or altering any records or evidence relating to the foregoing;

G.Ordering the transfer or cancellation of the infringing "thetalklane" domain identifier and directing removal of the Infringing Websites;

H.Ordering the impoundment and destruction, or other reasonable disposition, of all copies of the Photographs made or used in violation of Plaintiff's exclusive rights, pursuant to 17 U.S.C. § 503;

I.Awarding Plaintiff her reasonable attorneys' fees, costs, and disbursements to the extent permitted by law, including her full costs under 17 U.S.C. § 505; and

J. Granting such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: New York, New York

_______________, 2026

Respectfully submitted,

________________________________
Anu Shah
*Plaintiff, Pro Se*